Vance PITMAN, Appellant,

v.

CITY OF COLUMBIA, Respondent.

No. WD 71112.

Missouri Court of Appeals, Western District.

April 13, 2010.

Marvin Tofle, for Appellant.

Jeffrey O. Parshall, for Respondent.

Before Division Two: JOSEPH M. ELLIS, Presiding Judge, VICTOR C. HOWARD, Judge and GARY D. WITT, Judge.

### VICTOR C. HOWARD, Judge.

Vance Pitman appeals the trial court's directed verdict in favor of the City of Columbia, Missouri, (City) on his claims for unjust enrichment and assumpsit for money had and received. Detective Pitman sued the City seeking reimbursement of contributions he made to the City's police retirement plan since 1991. He raises nine points on appeal claiming that the trial court erred in entering directed verdict in favor of the City because he presented substantial evidence of each element of unjust enrichment and assumpsit for money had and received and the City failed to prove its affirmative defenses as a matter of law. The judgment is affirmed in part and reversed in part, and the case is remanded with directions.

### Facts

Detective Pitman has been employed by the City's police department since 1982. The City, by ordinance, provides a retirement plan for police officers. The retirement plan is a "defined benefit plan." After 20 years of service, a retiree receives 60% of the average of his three highest years of salary; after 25 years, a retiree receives 70%.

Before 1983, police officers could retire with normal retirement benefits after 25 years of service. The retirement plan was amended in 1983 to reduce the service requirement to 20 years. To fund the cost of the change, police officers were given two options, referred to throughout this case as "Option 1" and "Option 2."

Under Option 1, an officer would be allowed to advance to the top of his pay grade, but 4.85% of his gross pay would be withheld and paid into the retirement plan. Under Option 2, an officer's maximum gross pay would be capped at 3.95% less than he would otherwise have earned; however, the City would make the 4.85% contribution for the officer to the retirement plan. An officer near retirement might choose Option 1 to maximize his retirement benefit, which is based on the average of his three highest years of salary. Under Option 1, his gross pay would be higher than it would be under Option 2.

Detective Pitman initially chose Option 2. The next year, on the advice of older co-workers, he switched to Option 1 to maximize his plan benefits. Pursuant to his election of Option 1, 4.85% of gross pay was deducted and paid to the retirement plan.

In 1991, Detective Pitman was a member of the United States Army Reserve. He was called for active duty during the first Gulf War and served in Wisconsin from July through December of that year. While Detective Pitman was on Reserve Duty in September 1991, Chief of Police Ernest Barbee notified police officers that the City had revised the retirement plan. Under the change, all officers would be allowed to advance to their maximum pay grade. An officer under Option 2 would no longer be limited to 96.05% of the maximum but would be allowed to advance to the top of his pay grade through regular merit increases. An officer under Option 1 would be allowed to switch to Option 2 at any time. Upon switching options, the officer would no longer contribute 4.85% of his gross pay to the retirement plan; instead, the City would make the contribution for the officer. The officer's pay would also be reduced by 3.95% to offset the City's added pension costs, but the officer would be eligible to eventually recoup the pay reduction through regular merit increases and eventually progress to the top of his pay grade.

Detective Pitman returned to the police department in January 1992. In April 1992, during the course of his annual review, Detective Pitman received a memorandum from Deputy Chief Highbarger regarding the two options for the retirement plan. The memo set out Detective Pitman's salary schedule under Option 1 and Option 2. It showed that under Option 1, Detective Pitman was at his maximum salary. It also showed that if he were to change to Option 2, his base salary would initially be reduced by 3.95% but that with future merit increases, he would eventually make up the loss in pay. The memo did not specifically state that an Option 2 officer would be able to advance to the top of his pay grade like an Option 1 officer. Finally, the memo suggested Detective Pitman make further inquiry regarding the two options.

Detective Pitman chose not switch to Option 2 for several reasons. He did not believe the numbers were correct in the memorandum, and he did not want to take a pay cut at the time because he was going through a divorce. Detective Pitman also chose to remain in Option 1 because he wanted to maximize his retirement benefit by advancing to the top of his pay grade. While the memo explained that he would eventually be able to recoup the temporary loss in pay after switching to Option 2, Detective Pitman was unsure whether he would be able to advance to the top of his pay grade if he elected Option 2. He did not make further inquiry into Option 2 at that time.

From 1997–2000, Detective Pitman was the President of the Columbia Police Officers Association. He would participate in "meet and confer" sessions with the City's negotiating team regarding police officer business including the retirement plan. At one such session, City representatives mentioned to Detective Pitman that he was the only police officer in Option 1 and that they needed to discuss the issue. Detective Pitman told the representatives that he was at the session to represent all officers and would not discuss his own business at that time. Neither the City nor Detective Pitman initiated a discussion after the session.

Sometime before 2000, Director of Finance Lori Fleming discussed Detective Pitman's situation with Captain Sam Har-

gadine. Ms. Fleming told Captain Hargadine that Detective Pitman could switch to Option 2 without the 3.95% reduction in pay. Thereafter, in a brief conversation in the police department hallway, Captain Hargadine told Detective Pitman that if he switched to Option 2, his take-home pay would be higher. Detective Pitman responded that he wasn't concerned about his take-home pay, he wanted a higher average salary before retirement to maximize his retirement benefits. Captain Hargadine told Detective Pitman that he was "hurting" himself by not switching to Option 2. Detective Pitman could not recall at trial if Captain Hargadine told him that he could switch to Option 2 without the 3.95% reduction in his pay.

In 2002, Detective Pitman became eligible for retirement. He discussed his retirement plans with Detective Skip McGuire, who was also near retirement. At the time, Detective McGuire was "spiking" his retirement—working as much overtime as possible in his last three years to raise his average salary. Detective Pitman told Detective McGuire that he did not need to "spike" his retirement because he earned a higher salary by virtue of being in Option 1. Detective McGuire told Detective Pitman that there was no difference in pay between Option 1 and Option 2.

Following this discussion, Detective Pitman filed a grievance with the City in September 2002 claiming entitlement to "five percent additional salary." Detective Pitman's complaint was processed through his supervisor, the Chief of Police, the City Director of Human Resources, and, finally, the City Manager. It was denied at each stage. In the City Manager's denial, he wrote, "If you have not yet done so, I strongly urge you to switch from option 1 to option 2." Detective Pitman continued to select Option 1 after his complaint was denied through trial because he was afraid that he would lose "standing to receive [his] money back."

Thereafter, Detective Pitman sued the City for breach of contract, declaratory judgment, unjust enrichment, and assumpsit for money had and received seeking reimbursement of contributions he made to the City's police retirement plan since 1991. At the close of Detective Pitman's evidence, the City filed a motion for directed verdict asserting, *inter alia*, that Detective Pitman failed to present substantial evidence of each element of his causes of action and that it proved as a matter of law several of its affirmative defenses including statute of limitations and voluntary payment. The trial court entered a directed verdict in favor of the City and against Detective Pitman on all four counts. Detective Pitman now appeals the directed verdict entered on his claims for unjust enrichment and assumpsit for money had and received.

Detective Pitman raises several points on appeal claiming that the trial court erred in granting a directed verdict in the City's favor because he made a submissible case for his claims of unjust enrichment and assumpsit for money had and received and the City failed to establish any of its affirmative defenses as a matter of law.

**Standard of Review**

A trial court should enter a directed verdict when the plaintiff fails to make a submissible case or when the defendant establishes an affirmative defense as a matter of law. *Olsen v. Liberty Group Mo. Holdings, Inc.*, 250 S.W.3d 720, 721 (Mo.App. W.D.2008). "To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability." *Atkinson v. Corson*, 289 S.W.3d 269, 281 (Mo.App. W.D.2009) (citation and internal quotation marks omitted). "Sub-

stantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Id.* (citation and internal quotation marks omitted). In reviewing whether the plaintiff made a submissible case, the evidence is viewed in the light most favorable to the plaintiff, giving him the benefit of all reasonable inferences and disregarding the defendant's evidence except to the extent that it aids the plaintiff's case. *Id.*

A party is entitled to a directed verdict on an affirmative defense if it proves the defense as a matter of law. *Damon Pursell Constr. Co. v. Mo. Highway & Transp. Comm'n*, 192 S.W.3d 461, 475 (Mo.App. W.D.2006). A trial court may not enter a directed verdict on an affirmative defense unless no factual issues with respect to the affirmative defense remain for the jury to decide. *Id.* A judgment based on a directed verdict is affirmed if any ground asserted in the defendant's motion supports it. *Meyer v. Smith*, 298 S.W.3d 596, 597 (Mo.App. E.D. 2009).

### Unjust Enrichment and Assumpsit for Money Had and Received

Detective Pitman argues that the trial court erred in directing a verdict in favor of the City on his claims for unjust enrichment and assumpsit for money had and received. He contends that he offered substantial evidence of the elements of the claims to submit the claims to the jury.

Unjust enrichment occurs where a benefit is conferred upon a party under circumstances in which retention of that benefit without paying its reasonable value would be unjust. *Miller v. Horn*, 254 S.W.3d 920, 924 (Mo.App. W.D.2008). "The principle of unjust enrichment has given rise to the doctrine of quasi-contract, also known as a contract implied in law, as

a theory of recovery." *White v. Pruiett*, 39 S.W.3d 857, 863 (Mo.App. W.D.2001) (citation and internal quotation marks omitted). The essential elements of quasi-contract are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable." *Id.* (citation and internal quotation marks omitted). The last element—unjust retention of the benefit—is considered the most significant and most difficult of the elements to apply. *Assoc. Eng'g. Co. v. Webbe*, 795 S.W.2d 606, 608 (Mo.App. E.D.1990).

" 'An action for money had and received is an action sounding in assumpsit.' " *White v. Camden County Sheriff's Dep't*, 106 S.W.3d 626, 634 (Mo.App. S.D. 2003) (citation omitted). Such action is appropriate where the defendant received money from the plaintiff under circumstances that in equity and good conscience call for the defendant to pay it to the plaintiff. *Karpierz v. Easley*, 68 S.W.3d 565, 570 (Mo.App. W.D.2002). An action for money had and received " 'lies for restitution of money that belongs in good conscience to the plaintiff, but was obtained by the defendant by duress or other means making it unjust for the defendant to keep the money.' " *Id.* (citation omitted). An action for money had and received is also founded upon a contract implied in law. *Id.* Its elements are: (1) the defendant received or obtained possession of the plaintiff's money; (2) the defendant thereby appreciated a benefit; and (3) the defendant's acceptance and retention of the money was unjust. *Ward v. Luck*, 242 S.W.3d 473, 476 (Mo.App. E.D. 2008).

The essence of unjust enrichment is that the defendant has received a benefit that it would be inequitable for him to retain. *Patrick v. Koepke Constr., Inc. v. Woodsage Constr. Co.*, 844 S.W.2d 508, 515 (Mo.App. E.D.1992). "Unjust enrichment permits restitution based upon the value of the benefit received" by the defendant. *Id.* at 516. The measure of recovery in a quasi-contractual action is not the actual amount of the enrichment, but the amount of the enrichment that, as between the two parties, would be unjust for one party to retain. *White*, 39 S.W.3d at 863; *Woodsage Constr.*, 844 S.W.2d at 515–16. Thus, a plaintiff must present evidence of the amount of the benefit conferred upon the defendant. *Miller*, 254 S.W.3d at 925; *Manfield v. Auditorium Bar & Grill, Inc.*, 965 S.W.2d 262, 267 (Mo.App. W.D.1998).

Viewing the evidence in the light most favorable to Detective Pitman and giving him the benefit of all reasonable inferences, Detective Pitman presented substantial evidence for every fact essential to liability and was accordingly entitled to submit the issues to the jury. Specifically, Detective Pitman presented evidence that, under Option 1, he contributed 4.85% of his salary to the retirement plan since 1991. The Director of Finance conceded at trial that the City paid less to fund the retirement plan because of Detective Pitman's contributions to the plan. The evidence could have permitted the jury to find that the City received Detective Pitman's money or benefitted from it and appreciated the benefit. Additionally, Detective Pitman presented evidence that he did not receive the advantage of a higher salary from his contributions. After the retirement plan change in 1991, an officer in Option 2 could advance to the top of his pay grade just as an officer in Option 1. Detective Pitman claimed he was never told of the change in the retirement plan.

This evidence allows a finding by the jury that the City's retention of at least some amount of the contributions he made was unjust.

Given the standard of review, it cannot be said as a matter of law that the jury could not have found in Detective Pitman's favor on his claims that his contributions to the retirement plan conferred a benefit upon the City under circumstances in which retention of that benefit without paying its reasonable value would be unjust. Detective Pitman's claims of unjust enrichment and money had and received should have been submitted to the jury, and the trial court erred in entering a directed verdict in the City's favor on these claims. The points are granted.

### Voluntary Payment

Detective Pitman also argues that the trial court erred in entering a directed verdict in favor of the City on its affirmative defense of voluntary payment. He contends that factual issues with respect to the affirmative defense remained for the jury to decide.

The voluntary payment doctrine is a recognized defense to a claim for unjust enrichment and an action for money had and received. *Huch v. Charter Commc'n, Inc.*, 290 S.W.3d 721, 726 (Mo. banc 2009); *Hertz Corp. v. Raks Hospitality, Inc.*, 196 S.W.3d 536, 544 (Mo.App. E.D.2006). The doctrine provides "that a person who voluntarily pays money with full knowledge of all the facts in the case, and in the absence of fraud and duress, cannot recover it back, though the payment is made without sufficient consideration, and under protest." *Huch*, 290 S.W.3d at 726 (citation and internal quotation marks omitted). "Unless there is fraud or duress, the voluntary payment doctrine prohibits a person who voluntarily

pays money with full knowledge of the facts from recovering money." *Id.*

■■■ Generally, restitution will be granted when payment is made under mistake of fact but not under mistake of law. *Western Cas. & Sur. Co. v. Kohm,* 638 S.W.2d 798, 800 (Mo.App. E.D.1982). This is true even if the mistake is due solely to lack of care by the payor. *Blue Cross Health Servs., Inc. v. Sauer,* 800 S.W.2d 72, 75 (Mo.App. E.D.1990). The payor's lack of care will not diminish his right to recover or justify retention of a windfall by an unintended beneficiary. *Hertz,* 196 S.W.3d at 544. Thus, possession of information necessary to determine that payment is mistaken does not constitute voluntary payment made with full knowledge of the facts. *Id.*

■■■ "[W]here money has been voluntarily paid with full knowledge of the facts it cannot be recovered on the ground that the payment was made . . . under a mistake of law." *Am. Motorists Ins. Co. v. Shrock,* 447 S.W.2d 809, 811 (Mo.App. 1969). "A mistake of law occurs where a person is truly acquainted with the existence or nonexistence of facts, but is ignorant of, or comes to an erroneous conclusion as to, their legal effect." *Id.* (citation and internal quotation marks omitted).

■■■ Fact issues remained for the jury regarding whether Detective Pitman contributed to the retirement plan with full knowledge of the facts from 1991 until September 2002. Detective Pitman presented evidence that he was never told that an officer in Option 2 could advance to the top of his pay grade just as an officer in Option 1. He testified that one reason he remained in Option 1 during that time period was because he wanted to maximize his retirement benefit by earning the highest possible salary. He also testified that if he had known he was not earning a higher salary than officers in Option 2, he would not have remained in Option 1 and authorized the extra contributions to the retirement plan. While Officer Pitman acknowledged that several people advised him during that time period that it would be advantageous for him to switch to Option 2 and that he never attempted to learn more about the options, his lack of care does not justify retention of a windfall by the City. The City was not entitled to a directed verdict on its affirmative defense of voluntary payment on Detective Pitman's claims of unjust enrichment and money had and received from 1991 until September 2002.

■■■ On the contrary, no fact issues remained for the jury regarding whether Detective Pitman voluntarily made his contributions with full knowledge of the facts after September 2002. Detective Pitman concedes on appeal that he learned in 2002 of the retirement plan change; specifically that an officer in Option 2 could advance to the top of his pay grade. At trial, he testified that Detective McGuire told him that there was no difference in pay between Option 1 and Option 2. Following this conversation, Detective Pitman filed a grievance with the City in September 2002 claiming entitlement to the contributions he made to the retirement plan after the plan change. Detective Pitman testified that he remained in Option 1 after September 2002 through trial because he was afraid that he would lose "standing to receive [his] money back." Detective Pitman continued to choose Option 1 and contribute money to the retirement plan after September 2002 with full knowledge of the facts but under the erroneous conclusion that he had to remain in Option 1 to maintain his ability to recover under his claims of unjust enrichment and money had and received. His misconception of the legal effect of switching from Option 1

was not a mistake of fact but a mistake of law that prevents him from recovering money voluntarily paid after September 2002. The trial court, therefore, did not err in entering a directed verdict in the City's favor on Detective Pitman's claims of unjust enrichment and money had and received for the time period after September 2002.

## Statute of Limitations

■ Finally, Detective Pitman argues that the trial court erred in entering a directed verdict in favor of the City on its affirmative defense of statute of limitations. He contends that factual issues with respect to the affirmative defense remained for the jury to decide.

■ The parties agree that Detective Pitman's claims are governed by the five-year statute of limitations in section 516.120, RSMo 2000, but they disagree as to when the statute of limitations began to run. Generally, a statute of limitation begins to run when the cause of action accrues to the person asserting it. *D'Arcy & Assocs., Inc. v. K.P.M.G. Peat Marwick, L.L.P.,* 129 S.W.3d 25, 29 (Mo.App. W.D. 2004). For purposes of sections 516.100 to 516.370, the cause of action shall be deemed to accrue "when the damage resulting therefrom is sustained and is capable of ascertainment." § 516.100, RSMo 2000. "[T]he capable of ascertainment test is an objective one." *Powel v. Chaminade Coll. Preparatory, Inc.,* 197 S.W.3d 576, 584 (Mo. banc 2006). The issue is not when the injury occurred or when the plaintiff subjectively learned of the wrongful conduct. *Id.* Damage is capable of ascertainment "when a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." *Id.* "In other words, the statute of limitations

begins to run when the 'evidence was such to place a reasonably prudent person on notice of a potentially actionable injury.'" *State ex rel. Marianist Province of U.S. v. Ross,* 258 S.W.3d 809, 811 (Mo. banc 2008)(quoting *Powel,* 197 S.W.3d at 584).

■ Because the capable of ascertainment standard is an objective one, when the relevant facts are not contested, the statute of limitations can be decided by the court as a matter of law. *Id.* When contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, however, it is a question of fact for the jury to decide. *Id.*

In this case, different conclusions could have been drawn from the evidence regarding when damage was sustained and capable of ascertainment. Evidence was presented that Detective Pitman received a memo after he returned from the Gulf War setting out his salary schedule under Option 1 and Option 2. He was later told that he was the only officer in Option 1 and that his take-home pay would be more under Option 2. Detective Pitman testified that he did not learn of the 1991 change to the retirement plan until his conversation with Detective McGuire in 2002. Fact issues remained for the jury regarding when Detective Pitman's causes of action accrued for purposes of the statute of limitations. The trial court should have submitted the statute of limitations issue to the jury.

## Conclusion

As set forth above, the judgment of the trial court is affirmed in part and reversed in part. The case is remanded for a new trial on Detective Pitman's claims of unjust enrichment and assumpsit for money had

and received for the time period 1991 to September 2002.

All concur.