

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

MIGNON L. LAMBLEY, ET AL.,      )
                         )
        Appellants,         )
                         )
v.                       )        WD82645 (Consolidated with WD82652)
                         )
KIM L. DIEHL, TRUSTEE, ET AL.,    )        Opinion filed:  June 9, 2020
                         )
        Respondents.      )

**APPEAL FROM THE CIRCUIT COURT OF BATES COUNTY, MISSOURI**
**THE HONORABLE HAROLD L. DUMP, II, JUDGE**

Division Three:  Anthony Rex Gabbert, Presiding Judge,
Edward R. Ardini, Jr., Judge and W. Douglas Thomson, Judge

This action involves a dispute between siblings regarding the administration of their late parents' trusts, both of which named Respondent Kim Diehl as successor trustee. Appellants Mignon Lambley and Sydney Burch filed a petition in the Circuit Court of Bates County seeking to remove their brother Kim[1] as successor trustee and requesting financial restitution for Kim's personal use of the trusts' assets. Kim filed counter- and cross-claims asserting counts of quantum meruit, unjust enrichment, and contribution, as well as seeking a declaration of rights and instructions from the trial court. After a bench trial, the trial court entered its judgment denying Mignon and Sydney's claims and finding in favor of Kim on each of his claims. Mignon and

---

[1] Because many of the individuals involved in this litigation share the same last name, we use first names for ease of reference. No familiarity or disrespect is intended.

Sydney appeal. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## Factual and Procedural Background[2]

*Terms of the Trusts*

Raymond O. Diehl and Phyllis S. Diehl, the parents of the parties to this action, were farmers, and the bulk of their assets were farmland, livestock, and farming equipment. On February 14, 1995, Phyllis executed the Phyllis S. Diehl Revocable Inter Vivos Trust ("Phyllis Trust") and Raymond executed the Raymond O. Diehl Revocable Living Trust ("Raymond Trust"). Phyllis was the named grantor and trustee of the Phyllis Trust and Raymond was the named grantor and trustee of the Raymond Trust. Both trusts named Kim as the successor trustee. Each trust was revocable until the death of the grantor, at which point the trust became irrevocable.

Phyllis died on January 31, 2005. The Phyllis Trust provided that the following shall occur upon her death:

ITEM VI – PROVISIONS AFTER GRANTOR'S DEATH

After the death of the Grantor, the net income derived from the Trust Estate,
together with the principal thereof, shall be held, handled, divided and distributed
as follows, to-wit:

. . .

2. <u>During Lifetime of Spouse</u>. During the lifetime of Raymond O. Diehl, the Trustee shall pay over and deliver to him the net income from the Trust Estate at least annually. Should the Trustee in the Trustee's sole discretion, deem that the aforesaid payments, together with such other income as my said spouse may have, is insufficient at any time due to sickness, emergency, or other compelling circumstances, properly to provide health, education, support, or maintenance for said spouse, then in addition to the above, I authorize and empower my Trustee to use, pay to, apply or expend for my said spouse, such part of the principal of the

---

[2] We state the evidence in the light most favorable to the judgment. *See Howard Cnty. Ambulance Dist. v. City of Fayette*, 549 S.W.3d 1, 4 (Mo. App. W.D. 2018).

2

Trust Estate as in the sole discretion of the Trustee is deemed necessary and advisable under said circumstances.

3. <u>After Death of Spouse.</u> After the death of Raymond O. Diehl, or upon the death of the Grantor if Raymond O. Diehl shall predecease her, the principal and income of the Trust Estate will be managed and distributed as follows:

> (a) The Trustee may make adequate reserves for and pay the expenses of the last illness, funeral, and marker of my spouse. . . . .
>
> (b) The remaining principal and interest of the Trust Estate will be paid over and distributed free of trust, in equal shares, to Grantor's children, Kim L. Diehl, Sydney Burch, and Mignon Diehl. . . .

The assets held by the Phyllis Trust that are relevant to this action include a John Deere 4560 tractor and several tracts of real property. The parties refer to these tracts as "H Highway" (approximately 80 acres), "Wilson Place" (approximately 306 acres), "Ossie" (approximately 137 acres) and "Ralph" (approximately 40 acres).[3] Collectively, we refer to this real property as the "Phyllis Trust property."

As originally executed, the Raymond Trust—like the Phyllis Trust—provided that upon the death of both spouses, "[t]he remaining principal and interest of the Trust Estate will be paid over and distributed free of trust, in equal shares to Grantor's children, Kim L. Diehl, Sydney Burch, and Mignon Diehl." However, on May 12, 2010, Raymond amended the trust provisions relating to the distribution of the Raymond Trust's assets upon his death. The amended provisions provided that:

ARTICLE VII/VIII AMENDED

. . .

**(2) Final Distribution.** The principal and interest of the trust estate will thereafter as promptly as is reasonably feasible following the conclusion of any tax returns

---

[3] At the time of Phyllis's death, the only real property held by the Phyllis Trust was Wilson Place and a one-half undivided interest in H Highway. In 2006—through various agreements not in dispute here—the Phyllis Trust acquired Ossie, Ralph, and a 100% undivided interest in H Highway.

3

and payment of taxes or establishment of reasonable reserves therefore, be paid over and distributed free of trust as follows:

a. **The 141 acre "Cotton Place".** I direct that the 141 acre "Cotton Place" joins the land of my son, Kim L. Diehl. I direct that this land be promptly distributed to Kim L. Diehl or his then living issue per stirpes. [Legal description of the "Cotton Place" land omitted.]

b. **The 544 acre "Home Place".** I direct that the 544 acre "Home Place" be promptly distributed to my son, Kim L. Diehl. Prior to distribution, my Trustee is directed to encumber the property for a loan of $250,000 on such terms as the Trustee may in his sole discretion may [sic] deem appropriate. From these borrowed funds, $50,000 is to be paid to my daughter, Sydney Burch, and the remaining loan proceeds of $200,000 are to be paid to my daughter, Mignon L. Diehl, now Lambley. The real estate is then to be conveyed and distributed to my son, Kim L. Diehl, subject to the mortgage, which the distributee, Kim L. Diehl, is to assume and agree to pay. I am aware that this distribution is not an equal distribution and that I am substantially favoring my son, Kim. L. Diehl. [Legal description of the "Home Place" land omitted.]

c. **Livestock.** With the considerable assistance of my son and his children, I have accumulated a substantial herd of livestock. All livestock in which I have any interest shall be distributed immediately and without delay at the time of my death to my son, Kim L. Diehl, or his then living issue per stirpes.

d. **Farm Machinery, Equipment, Etc.** All farm machinery equipment and all equipment, all tools and all supply of feed, fencing material, farm supplies, miscellaneous farm appliances and other personal property kept on hand around my farm real estate, together with all motor vehicles including motorized farm equipment and machinery, which I own at the time of my death, including all unexpired insurance thereon shall be distributed immediately and without delay at the time of my death to my son Kim L. Diehl, or his then living issue per stirpes.

e. **Trust Assets Not Otherwise Herein Distributed.** At the time of my death, if the Trust holds other assets not distributed under the foregoing provisions, said assets shall be distributed in equal shares, one-third to Kim L. Diehl, one-third to Mignon L. Diehl and one-third to Sydney S. Burch, or their then living issue per stirpes.

Raymond died on February 20, 2013.

*Use of Phyllis Trust Property from January 31, 2005*
*to February 20, 2013*

4

After Phyllis died, the income earned by the Phyllis Trust consisted of crops and government farm payments. Raymond obtained bank loans and used those funds, in part, to pay for inputs to farm on the Phyllis Trust property.[4] The loans were secured by Raymond's cattle.

Corn and soybeans were grown on the Phyllis Trust property. When corn was harvested from Wilson Place, Ralph, and Ossie, it was distributed to Raymond, and he generally used it to feed his cattle.[5] When soybeans were harvested from that property, Raymond generally sold the crops and added the proceeds to his personal checking account. The Farm Service Agency payments for Wilson Place, Ralph, and Ossie were directly distributed to Raymond. The Phyllis Trust did not maintain a bank account.

During this time period, Kim, his sons, and employees hired by Kim provided custom farm work for the Phyllis Trust to generate the corn and soybeans. These farm services included: anhydrous application, fertilizer application, disking, rolling and finishing, planting, spraying, combining and hauling, spraying brush, mowing roadsides, baling hay, scraping, mowing pasture, and chopping silage. To perform these services, Kim used his own diesel fuel and equipment. Kim's equipment included a tractor and auger cart, a sprayer worth approximately $175,000-$200,000, a four-wheel drive tractor worth approximately $150,000-$300,000 with an anhydrous fertilizer applicator attachment worth approximately $57,000, a combine worth approximately $500,000, a chore tractor, a wheat combine worth approximately $200,000-$300,000, a drill worth approximately $55,000, a grain wagon to transfer feed, and a trailer truck. Although Raymond owned some dated farm equipment, it was inadequate to farm the Phyllis Trust property.

---

[4] Farm inputs are those items necessary to grow crops, such as seed, fertilizer, and spraying chemicals.

[5] Raymond requested that Kim farm H Highway in exchange for Kim allowing Raymond to run his cattle on Kim's personal land and collect rent on a residential property Kim owned. Thus, Kim paid all input costs for H Highway during this time period and received the crops harvested from and the Farm Service Agency payments for H Highway.

5

*Kim's Actions After Raymond's Death*

After Raymond died, Kim continued to farm the Phyllis Trust property. At the time of his death, Raymond owed to Community First Bank $389,645.64 in loans, the proceeds of which had been partially used to pay for the inputs for Wilson Place, Ralph, and Ossie. On March 31, 2015, Kim personally assumed the loans. Kim also personally paid vendors who were owed for items purchased or services rendered to the Phyllis Trust, the Raymond Trust, and Raymond's estate.

*Pre-Trial Procedural History*

Following Raymond's death, Mignon, Sydney, and Kim engaged in protracted, yet unsuccessful, settlement negotiations regarding the disposition of the trusts' assets.

In May 2015, Mignon and Sydney initiated this action by filing a Petition for Accounting, for Removal of Trustee and for Financial Restitution. Two months later they filed an amended petition, naming as defendants Kim in his individual capacity, Kim as trustee of the Phyllis Trust, Kim as trustee of the Raymond Trust, and Kim as personal representative of Raymond's estate. In Count I they requested the trial court remove Kim as trustee for both trusts and replace him with a qualified independent third party, alleging Kim breached his fiduciary duty of loyalty and failed to provide accountings as required. In Count II they sought accountings from Kim for both trusts. In Count III they requested the trial court order Kim "to provide financial restitution to each of the Trusts for the fair market rental value of the Trust property he used for his personal farming operations during the entire period of time he has been acting as Trustee of the Trusts."

In response, Kim asserted five "Counter-Claims and Cross-Claims": (1) a claim of quantum meruit to recover the reasonable value of farming services he rendered to the Phyllis Trust; (2) a claim of unjust enrichment to recover the amount of loans he assumed that benefitted the Phyllis Trust; (3) a claim of contribution for the loan payments he made that benefitted the Phyllis Trust;

6

(4) a request for declaration of rights regarding various trust administration issues, including a declaration as to the "fair market value of cash rental" Kim owed the Phyllis Trust for farming the Phyllis Trust property after Raymond's death; and (5) a request for instructions regarding administration of the trusts.

On November 6, 2015, Mignon and Sydney filed a motion for interim relief requesting, among other things, that the trial court order Kim to pay rent for farming land held by the Phyllis Trust after the date of Raymond's death. The trial court granted the motion in part and ordered Kim to pay $137,826.67 into an escrow account, such sum representing two-thirds of the rental amount for land in the Phyllis Trust from the date of Raymond's death through February 2017. On March 1, 2017, Kim requested the trial court order him to pay additional amounts into escrow for rent from March 2017 through February 2018. The trial court granted Kim's motion and ordered him to "pay $34,456.67 into escrow for security for rent from March 1, 2017 to February 28, 2018."

*Trial*

Beginning on January 29, 2018, the trial court conducted a six-day bench trial. On the second day of trial, Mignon and Sydney dismissed Count II of their petition, in which they had requested trust accountings from Kim. Also during trial, counsel for Mignon and Sydney advised that they were seeking prejudgment interest and that they intended to filed a post-trial motion requesting such an award.

Kim presented evidence at trial relating to the value of the custom farm work he provided the Phyllis Trust from 2005 to 2012. Kody Claflin, an agricultural services provider, provided expert testimony as to the reasonable value in Bates County of each of the farming services Kim provided the Phyllis Trust.

Kim testified about conversations that had occurred between him and Raymond relating to Kim being paid for the custom farm work he was performing. Specifically, Kim stated that in 2012, Raymond said to him, "I don't know how I'll ever repay you boys back . . . some day we'll try to get this figured out." In that same conversation Raymond said, "I don't think I want to be involved in farming anymore . . . you guys have been farming it. I'm going to let you guys farm it next year and we'll get squared up or we'll take care of it later."

Kim's son Dane Diehl, who had performed custom farm work for others in Bates County, testified about the usual practices in the community regarding agreements to perform such work. Dane stated that he did not sign contracts or enter into written agreements as to when or how much he would get paid for his services, but that there was an "understanding that at some point" he would get paid based on promises made by landowner. The language typically used to convey such promises of payment included, "I'll get you paid one of these days," "we'll get squared away one of these days or come see me one of these days." He testified that he entered into such informal agreements because of "loyalty and trust and knowledge of people in the area," and that "you are going to get reimbursed at some point; you just don't know when around the community." He further stated that sometimes it took years to be paid for the farm work performed.

*Post-Trial Procedural History*

At the conclusion of trial, the trial court took the case under advisement pending post-trial briefing. The parties filed proposed findings of fact and conclusions of law, and Mignon and Sydney filed a Motion for Award of Prejudgment Interest. Kim opposed the motion.

On November 8, 2018, the trial court entered its initial judgment, which was incomplete in several respects.[6] The trial court entered a First Amended Judgment, which appeared to resolve the incomplete parts of the initial judgment.

In the First Amended Judgment, the trial court denied Counts I and III of Mignon and Sydney's petition and granted all of Kim's counter- and cross-claims. Relating to Kim's quantum meruit claim, the trial court found that Kim "shall be entitled to credit in the amount of $327,557.08 from the Phyllis Diehl Trust for his custom labor services from 2005 through 2012." Regarding Kim's unjust enrichment claim, the trial court found that Kim "shall be entitled to credit in the amount of $194,822.82 from the Phyllis Diehl Trust for loans used to benefit the Phyllis Trust." In response to Count V—Kim's claim requesting instructions—the trial court ordered Kim to encumber the Home Place in the amount of $250,000 and, "[i]mmediately upon obtaining the financing," pay $200,000 to Mignon and $50,000 to Sydney, as provided in the Raymond Trust. Also in response to Count V, the trial court found that "[t]he total amount due for rent for 2013 through 2017 [was] $247,476" and ordered Kim to transfer funds in the escrow account (which held Kim's rent payments for farming the Phyllis Trust property after Raymond's death) to the Phyllis Trust and execute a note payable to the Phyllis Trust for the remaining rent due. The trial court awarded Mignon and Sydney prejudgment interest on the $250,000 distribution and the $247,476 amount of rent owed.

The case was transferred to the Honorable Harold L. Dump, II after the trial judge's retirement. The parties filed motions to amend the judgment. In Kim's motion, he argued that the trial court should amend the judgment to exclude Mignon and Sydney's awards of prejudgment interest. The trial court heard argument on the motions to amend, granted Kim's motion, and

---

[6] For example, some of the findings of fact ended mid-sentence and there was a note that one of the legal conclusions made by the trial court still needed to be "looked up."

9

entered a Second Amended Judgment, which removed Mignon and Sydney's awards of prejudgment interest.

Mignon and Sydney appealed.[7] Additional facts are set forth in the analysis.

**Analysis**

Mignon and Sydney raise five points on appeal. In Point I they assert the trial court erred in finding in favor of Kim on his claims of quantum meruit and unjust enrichment in that there was insufficient evidence that the Phyllis Trust received and retained a benefit from Kim's custom farm work and assumption of Raymond's loans. In Point II they assert the trial court erred in finding in favor of Kim on his claim of unjust enrichment in that there was insufficient evidence of the amount of benefit conferred and retained. In Point III they argue that the trial court erred by refusing to apply the presumption that services provided by family members are rendered gratuitously. In Point IV they assert the trial court erred in denying their motion for prejudgment interest. Finally, in Point V they argue the trial court erred by "rubber stamping" Kim's proposed judgment. For ease of analysis, we address the points out of order.

*Standard of Review*

"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Id.* at 199. "Evidence has probative force if it has any tendency to make a material fact more or less likely." *Id.* When reviewing whether the trial court's judgment is supported by

---

[7] Kim filed a cross-appeal, however he voluntarily dismissed that appeal before the parties filed any briefing.

substantial evidence, we accept as true the evidence and inferences favorable to the judgment and disregard all contrary evidence. *Id.* at 200.

*Quantum Meruit Claim*
*(Addressing part of Point I and all of Point III)*

In his claim for quantum meruit, Kim sought reimbursement from the Phyllis Trust for the custom farm work he performed on land held by the Phyllis Trust. Mignon and Sydney argue in their first point that the trial court erred in finding in favor of Kim on this claim because there was insufficient evidence that the Phyllis Trust received and retained a benefit from Kim's custom farm work.[8] We disagree.

"The right to recover in quantum meruit arises when services are provided and accepted under circumstances that would justify an expectation of payment of the reasonable value of those services to the person providing them." *Moran v. Hubbartt*, 178 S.W.3d 604, 615 (Mo. App. W.D. 2005). "The principal function of this type of implied contract is the prevention of unjust enrichment." *Holliday Invs., Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. App. W.D. 2015). "Because quantum meruit is justified on the theory of unjust enrichment, it is understandable that both [a claim for quantum meruit and a claim for unjust enrichment] generally require that a benefit be conferred and inequitably retained." *Id.*

Mignon and Sydney acknowledge that a benefit was realized from Kim's custom farm work; however, they argue that it was Raymond, not the Phyllis Trust, who received and retained

---

[8] Mignon and Sydney also assert in this point relied on that the weight of the evidence "conclusively demonstrated there was no receipt or retention of any benefit." Thus, this point relied on fails to comply with Rule 84.04(d) because it purports to assert both a substantial-evidence challenge and an against-the-weight-of-the-evidence challenge, which are distinct claims. *See Ivie*, 439 S.W.3d at 199 n.11 (a substantial-evidence challenge and an against-the-weight-of-the-evidence challenge "must appear in separate points relied on in the appellant's brief to be preserved for appellate review"). Nonetheless, we are permitted to exercise our discretion to review unpreserved claims on appeal. *See id.* We will exercise our discretion to address the merits solely of Mignon and Sydney's substantial-evidence challenge, as this is the focus of their argument on appeal and because they fail to engage in the required "against-the-weight-of-the-evidence" analytical framework. *See Sauvain v. Acceptance Indem. Ins. Co.*, 437 S.W.3d 296, 304 (Mo. App. W.D. 2014).

the benefit, as the crops grown on Wilson Place, Ralph, and Ossie went directly to Raymond. But this argument overlooks the purpose and function of the Phyllis Trust: after Phyllis's death and while Raymond was still alive, the purpose of the Phyllis Trust was to provide income to Raymond. Kim's custom farm work allowed the Phyllis Trust to earn income in the form of crops and provide that income to Raymond. The Phyllis Trust could not have earned this income without custom farm services, and had Kim not provided those services, the Phyllis Trust would have had to pay others to provide them. Thus, the Phyllis Trust was enriched by $327,557.08—the value of the custom farm services that it did not have to pay to create income for its beneficiary. Therefore, the Phyllis Trust did receive and retain a benefit from Kim's custom farm work.

In arguing that only Raymond received and retained the benefit of Kim's services, Mignon and Sydney focus solely on who ultimately received the crops and the proceeds from the sale of those crops. Where recovery is sought from a trust under a theory of quantum meruit, however, the question of who receives and retains the benefit is not so narrowly drawn: both a trust and its beneficiary can receive and retain a benefit from the same provision of services. *See Scott v. United Carolina Bank*, 503 S.E.2d 149, 153 (N.C. Ct. App. 1998) (where the plaintiff sought recovery from a trust under a theory of quantum meruit, caregiving services she rendered to the beneficiary of the trust could be a benefit to both the beneficiary and the trust created for his care); *see also Nichols v. Donaldson*, 322 S.W.3d 155, 158-59 (Mo. App. E.D. 2010) (upholding trial court's finding that son—who was also trustee—was entitled to reimbursement from the trust under a theory of quantum meruit for the personal labor and diesel fuel son expended on farm property held by the trust after the grantor's death; the son's theory of recovery was that he had "performed valuable services and made material improvements to the Trust property that 'greatly benefitted all beneficiaries of the [Trust],'" which included him and his nieces). Because the benefit to

12

Raymond and the Phyllis Trust need not be mutually exclusive, the fact that Raymond benefited from Kim's custom farm work does not negate the benefit that the Phyllis Trust received and retained from those same services.

As described above, we find there was substantial evidence that the Phyllis Trust received and retained a benefit from Kim's custom farm work. Nonetheless, we cannot affirm the trial court's judgment finding in favor of Kim on his quantum meruit claim. Mignon and Sydney raised an affirmative defense to this claim, asserting that services rendered to family members are presumed to be gratuitous and Kim failed to overcome this presumption. The trial court concluded, as a matter of law, that this defense was inapplicable to actions involving trusts. In Point III, Mignon and Sydney argue that the trial court erred in so concluding, and we agree.

"The law presumes that a person expects compensation for their valuable services performed to benefit another unless the parties share familial ties, or are unrelated but have a special relationship from which a reasonable person would believe such services were gratuitously performed for the other." *In re Wyman*, 220 S.W.3d 471, 473 (Mo. App. W.D. 2007). "The defense of a family relationship is an affirmative defense," and the party asserting the defense has the burden to establish the existence of a familial or special relationship that gives rise to the presumption.[9] *See McMurry v. Magnusson*, 849 S.W.2d 619, 622 (Mo. App. E.D. 1993). If the party asserting the defense establishes the requisite familial or special relationship, the party against whom the defense was raised may rebut this presumption by showing the parties intended and understood that the services were to be paid for. *See id.*

---

[9] "For purposes of raising the presumption that services were rendered gratuitously, a family is defined as a collective body of persons under one head and one domestic government, who have reciprocal, natural, or moral duties to support and care for each other." *McMurry v. Magnusson*, 849 S.W.2d 619, 622 (Mo. App. E.D. 1993) (internal marks omitted). "Whether a family relationship existed is a factual issue." *Id.*

Here, the trial court concluded that "[w]hile family relationships have been recognized in actions under the probate code to create a presumption that services between family members were offered gratuitously, this does not apply in the current trust proceeding, which is a creature of equity." This conclusion, however, is not supported under Missouri law, as Missouri courts have applied the presumption in actions outside the probate code, including in equitable proceedings. *See, e.g.*, *McMurry*, 849 S.W.2d at 621-23 (in personal injury action, trial court erred by refusing to allow the jury to consider in determining plaintiff's damages whether care services rendered by plaintiff's sister were gratuitous in nature); *Brassfield v. Allwood*, 557 S.W.2d 674, 681 (Mo. App. 1977) (applying the presumption where children brought equitable claim against step-mother, seeking specific performance of an oral contract father allegedly made before he died wherein he promised the children that they would receive the father's real property if they helped him with his farming operation); *cf. Hoeper v. Liley*, 527 S.W.3d 151, 163 (Mo. App. W.D. 2017) (indicating the presumption could apply as a defense to an unjust enrichment claim, however refusing to consider whether the presumption applied under the facts of the case because the defendants did not plead or otherwise argue to the trial court that the presumption applied).

Furthermore, given the nature of a trust, we can discern of no reason why, as a matter of law, the presumption could not apply in a trust proceeding where those involved are close family members. A trust is not a legal entity; it is a relationship between the trustee and beneficiaries, who share title to trust property, the trustee holding legal title and the beneficiaries holding equitable title. *See Rouner v. Wise*, 446 S.W.3d 242, 251 n.8 (Mo. banc 2014) (defining a trust—other than a charitable, resulting, or constructive trust—as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held [the trustee] to equitable duties to deal with the property for the benefit of another person [the beneficiary]"); *Thompson v. Koenen*,

14

396 S.W.3d 429, 435 (Mo. App. W.D. 2013) ("It is well settled under Missouri law that a trust is not a legal entity." (internal marks omitted)); *Moore v. Moore*, 111 S.W.3d 530, 533 (Mo. App. S.D. 2003) ("The fundamental nature of a trust is the division of title; the trustee being the holder of legal title and the beneficiary of equitable title."). Thus, it could be presumed that services provided to the trust or its beneficiaries by family members of the trust's beneficiaries were intended to be rendered gratuitously. Whether the familial relationship necessary to invoke the presumption has been established, however, depends on the specific facts of the case. *See Scott*, 503 S.E.2d at 152 (acknowledging the presumption exists, but finding it did "not apply" where the individual providing the services and the beneficiary were "more distant adult relatives living apart").

Here, the trial court concluded, as a matter of law, that the presumption does not apply in proceedings pertaining to trusts. For the reasons described above, this conclusion was in error. Thus, we must remand to the trial court to determine whether, under the facts of this case, the requisite familial relationship was present to invoke the presumption.[10]

If the trial court finds that Mignon and Sydney have established the necessary predicate to invoke the presumption in this case, the question would then arise whether there was an agreement

---

[10] Although the trial court concluded as a matter of law that the presumption did not apply, it also found in paragraph 94 of the Second Amended Judgment that Mignon and Sydney "established their burden to prove as an affirmative defense that [Kim] had a family relationship with the Phyllis Trust such that services performed by [Kim] would be presumed to be gratuitous." However, the opposite finding was made in the First Amended Judgment, in which the trial court found Mignon and Sydney "did *not* establish their burden to prove as an affirmative defense that [Kim] had a family relationship with the Phyllis Trust such that services performed by [Kim] would be presumed to be gratuitous." (emphasis added). The judge who entered the Second Amended Judgment did not preside over the trial. Thus, he was without authority to change the factual findings made in the First Amended Judgment absent rehearing the evidence or obtaining a stipulation from the parties that he could make factual findings without hearing the evidence. *See* Rule 79.01; *Roberts v. Shaw*, 496 S.W.3d 557, 558-59 (Mo. App. S.D. 2016) ("Under Missouri law, a successor judge is without power to render a judgment based on testimony and evidence heard by his predecessor absent a stipulation by the parties," and in absence of such stipulation, "the court must either make a judgment consistent with the findings of the original trial court that heard the evidence or hold a new hearing."). The trial court should be mindful of these requirements when determining on remand whether the necessary familial relationship was present to invoke the presumption.

between Kim and a person with authority to bind the trust that Kim would be compensated for his custom farm services. *See McMurry*, 849 S.W.2d at 622 (once familial relationship is established, party against whom the defense was raised may rebut the presumption with "evidence tending to show that the parties intended and understood that the services were to be paid for by the recipient thereof"). After finding as a matter of law that the presumption did not apply, the trial court, nonetheless, made factual findings as to whether such an agreement existed. If the trial court had found that such an agreement to compensate existed, we could affirm the judgment in favor of Kim on his quantum meruit claim on this ground. However, the trial court's findings on this issue are inconsistent and ambiguous:

> 87. There was an agreement or understanding between the acting successor trustee [Raymond[11]], named successor trust[ee] [Kim] and its mandatory income beneficiary [Raymond] and discretionary principal beneficiary [Raymond] that Kim would be reimbursed at some future date for his services rendered. . . .

> . . .

> 95. Even assuming the presumption applies to Trust matters, and even assuming that [Mignon and Sydney] established a family relationship between Kim and the Phyllis Trust, or its beneficiaries, there was no credible testimony that the acting successor trustee [Raymond], the named trustee [Kim], and the mandatory income beneficiary [Raymond] and discretionary principal permissible beneficiary [Raymond] intended to pay Kim, and Kim expected to be paid, for custom labor services.[12]

> 96. There is no credible evidence that Raymond, as acting trustee and as beneficiary of the Trust, and Kim as named trustee, agreed to pay, and there was a mutual understanding that Kim would be paid for services rendered to the Trust for the benefit of Raymond. Consequently, any presumption of gratuitous services is overcome. [Citation omitted][13]

---

[11] The trial court found that "Raymond controlled Kim and Kim did whatever Raymond wanted," and that "in fact Raymond acted as successor trustee of the Phyllis Trust, after Phyllis' death until Raymond's death, despite the trust document nominating Kim to serve as successor Trustee."

[12] In the First Amended Judgment, the trial court found there *was* credible testimony that Raymond and Kim intended to pay Kim, and Kim expected to be paid, for custom labor services.

[13] In the First Amended Judgment, the trial court found there *was* credible evidence that Raymond and Kim agreed to pay, and there was a mutual understanding that Kim would be paid for the services rendered. Furthermore, we note

16

97. Kim relied upon promises that he would be paid for his custom labor services provided to the Phyllis Trust.

. . .

100. . . . Up until [the date of Raymond's death], Raymond had repeatedly promised Kim that he would be paid for the farming services at some later date when they would figure it out. The parties effectively agreed to postpone payment. Kim did not know he had sustained an actionable injury until Raymond died without ever paying Kim. Consequently, Kim's counterclaim for quantum meruit is not barred by the statute of limitations.

"An appellate court cannot rule on issues formulated on inconsistent and ambiguous findings." *Finest Place, Inc. v. Skidmore*, 477 S.W.3d 745, 747 (Mo. App. S.D. 2016). In light of the conflicting findings described above, we cannot determine whether the trial court found an agreement existed between Kim and an individual with authority to bind the trust that Kim would be compensated for his custom farm services. On remand, if the trial court determines the presumption of gratuitous family services has been established rendering the existence of such an agreement relevant, the trial court must clarify its factual findings in this regard. *Cf. Finest Place, Inc.*, 477 S.W.3d at 749 (reversing judgment based on trial court's inconsistent findings and remanding for further clarification of the trial court's factual findings).[14]

In sum, we find substantial evidence supported Kim's claim for quantum meruit, however, the trial court erred in concluding that, as a matter of law, Mignon and Sydney's affirmative

---

that standing alone this paragraph contains an inconsistency: if there was no credible evidence of a compensation agreement, then the presumption would *not* be overcome, i.e., without evidence of a compensation agreement, the presumption would remain that the work was intended to be performed gratuitously.

[14] As noted above, in the Second Amended Judgment the trial court made factual findings on the credibility of the evidence regarding the compensation agreement that differed from the findings made in the First Amended Judgment. On remand, to the extent factual findings are necessary on whether there was a compensation agreement, such findings may implicate Rule 79.01, and may require the successor judge to rehear the evidence on this issue or obtain a stipulation by the parties that he can make factual findings without hearing the evidence. *See* Rule 79.01; *see also Roberts*, 496 S.W.3d at 558-59.

defense to this claim was inapplicable. Thus Point I (as it relates to Kim's quantum meruit claim) is denied and Point III is granted.

*Unjust Enrichment Claim*
*(Addressing part of Point I and all of Point II)*

In his claim for unjust enrichment, Kim sought reimbursement from the Phyllis Trust for the loans he assumed upon Raymond's death, the proceeds of such loans having been used, in part, to purchase inputs for the Phyllis Trust property. In Points I and II Mignon and Sydney argue there was insufficient evidence to find in favor of Kim on his claim of unjust enrichment. Specifically, in Point I they assert the "record conclusively showed that the Phyllis Trust did not receive or retain any benefit" from "the proceeds of the loans that Raymond took out"; rather, that benefit flowed exclusively to Raymond. Alternatively, in Point II they argue there was insufficient evidence of the amount of the benefit conferred. We disagree with both assertions.

"Unjust enrichment occurs where a benefit is conferred upon a party under circumstances in which retention of that benefit without paying its reasonable value would be unjust." *Pitman v. City of Columbia*, 309 S.W.3d 395, 402 (Mo. App. W.D. 2010); *see also Holliday Invs., Inc.*, 476 S.W.3d at 295 (like a claim of quantum meruit, a claim of unjust enrichment "generally require[s] that a benefit be conferred and inequitably retained"). The measure of recovery in a claim for unjust enrichment "is not the actual amount of the enrichment, but the amount of enrichment which would be unjust for the defendant to retain." *Holliday Invs., Inc.*, 476 S.W.3d at 296. "Thus, a plaintiff must present evidence of the amount of the benefit conferred upon the defendant." *Pitman*, 309 S.W.3d at 403.

At trial, evidence was presented that at the time of Raymond's death, he owed $389,645.64 in Community First Bank loans, and Kim had assumed those loans. The trial court found "[t]here was evidence that at the minimum, inputs for the Phyllis Trust were purchased with at minimum

18

50% of the loan proceeds" and that the "Phyllis Trust accepted the benefits of such loan proceeds in the amount of $194,822.82." The trial court found that "Kim paid or assumed such loans such that the Phyllis Trust owes Kim the sum of $194,822.82 for the use of the loan proceeds in providing crop inputs."

In their first point, Mignon and Sydney argue that "while the loans were used to finance inputs to farming operations taking place on land owned by the Phyllis Trust," the "Phyllis Trust did not retain any of the benefits of the outputs from that farming activity," thus the Phyllis Trust "was not enriched . . . by the loans." But as described above regarding the custom farm services, the Phyllis Trust did not need to retain the crops or the income from the crops to retain a benefit from the loans. In order to produce income and provide such income to its beneficiary—i.e., to accomplish its purpose—the Phyllis Trust had to purchase inputs to be able to plant and harvest crops. The Phyllis Trust did not use its own assets to pay for the inputs; rather, the Phyllis Trust received proceeds from another source (loans which Kim later assumed) to plant crops and generate income. Had the Phyllis Trust paid for the inputs itself, its assets would have been reduced by the cost of that expense. Thus, the Phyllis Trust retained a benefit because it was able to generate income without paying for the crop inputs necessary to generate that income. In sum, we find there was substantial evidence that the Phyllis Trust received and retained a benefit from the Community First Bank loans that Kim assumed.

In Point II, Mignon and Sydney argue, alternatively, that there was insufficient evidence to support Kim's claim of unjust enrichment because there was "no evidence in the record at all regarding what portion of the loan proceeds funds (if any) that Raymond may have used for the purchase of crop inputs or any of the other items that purportedly conferred benefits upon the

19

Phyllis Trust." Again, we disagree, and find substantial evidence supported the trial court's finding that at least 50% of the loan proceeds were used to purchase inputs for the Phyllis Trust.

The evidence at trial showed that the Community First Bank loans were used to pay the following: input costs for Raymond's 65 acres of cropland and the Phyllis Trust's 260 acres of cropland, operating expenses for Raymond's cattle operation, the purchase of a truck in the amount of $35,589, the purchase of a piece of property called Ferrell Place in the amount of $60,145.45, and a loan interest payment in the amount of $15,645.64. Kim acknowledged that the loan proceeds used to purchase the truck and Ferrell Place were not spent on inputs for the Phyllis Trust property. Thus, subtracting the amount of loan proceeds used to pay for the truck, Ferrell Place, and the loan interest payment, the remaining $278,265.55 were used to pay for input costs and to operate Raymond's cattle business. Kim testified that were "not a whole lot of operating expenses on cattle" and that "a lot" of the loan proceeds went to buying inputs for the crops grown on the Phyllis Trust property. In fact, the evidence showed that of the loan proceeds used to pay for input costs, 80% were spent on property held by the Phyllis Trust.[15] Although there was not specific evidence as to the exact amount of loan proceeds spent on inputs for the Phyllis Trust, the above-described evidence provided a sufficient evidentiary basis for the trial court's finding that, at a minimum, 50% of the Community First Bank loan proceeds were used to pay the input costs for property held by the Phyllis Trust. Thus, sufficient evidence was presented to support the trial court's determination that the Phyllis Trust was conferred a benefit in the amount of at least $194,822.82.

Point I (as it relates to Kim's unjust enrichment claim) and Point II are denied.

---

[15] The input costs were spent on farming corn and soybeans on 325 acres; 65 of those acres belonged to Raymond and 260 were held by the Phyllis Trust. Thus 80% of the input costs were used to farm the Phyllis Trust property.

20

*Mignon and Sydney's Motion for Prejudgment Interest*

In Point IV Mignon and Sydney assert the trial court erred in denying their motion for prejudgment interest. Before we address this claim, we believe it helpful to set forth the facts surrounding Mignon and Sydney's request for prejudgment interest.

After the trial concluded, Mignon and Sydney filed a motion for prejudgment interest, requesting the trial court award them interest "on two sets of the moneys": (1) "the money [Kim] should have paid Plaintiffs as rent for his personal use of croplands and pasture lands in the Phyllis S. Diehl Trust;" and (2) the $250,000 distribution owed to them under the Raymond Trust. In its First Amended Judgment, the trial court awarded prejudgment interest to Mignon and Sydney on the rent due from Kim for farming the Phyllis Trust land from 2013 through 2017 and the $250,000 distribution from the Raymond Trust. The trial court did not include any findings in the First Amended Judgment explaining its reasons for these awards.

Kim moved to amend the judgment to remove the awards of prejudgment interest. Judge Dump heard argument on the motion, and subsequently made an entry advising that the First Amended Judgment "will be amended to remove the prejudgment interest award." Thereafter, the trial court entered the Second Amended Judgment, which removed the interest awards. As for its reason for denying prejudgment interest on the distribution from the Raymond Trust, the trial court found:

> 261. No pre-judgment interest should be awarded to either [Sidney], [Mignon] or Kim on their distributions from the Raymond Trust because no contract provides for such interest, no statute provides for such interest, and [Mignon and Sydney] did not receive a judgment of distribution given that they did not request distribution in their Petition.

The Second Amended Judgment contained no findings as to the reason the trial court declined to award prejudgment interest on the rent owed by Kim.

In their fourth point relied on Mignon and Sydney assert that "[t]he trial erred in denying [their] motion for pre-judgment interest based on the erroneous conclusion that pre-judgment interest was not available on equitable claims and that [they] had not adequately requested a distribution from the trusts."[16] Although we agree that prejudgment interest is available in equitable proceedings, we find that the trial court did not abuse its discretion in declining to award Mignon and Sydney prejudgment interest.

"[I]n equitable actions the decision whether to award prejudgment interest lies entirely in the trial court's discretion." *Taylor-McDonald v. Taylor*, 245 SW.3d 867, 878 (Mo. App. S.D. 2008). Thus, our review of the trial court's decision not to award prejudgment interest is for abuse of discretion. *See id.* (in sisters' action against brother—individually and as trustee—to recover funds they claimed were theirs through inheritance from their father, trial court's decision to award prejudgment interest was reviewed for abuse of discretion); *see also Robinson v. Langenbach*, --- S.W.3d ---, No. SC97940, 2020 WL 2392488, at *15 (Mo. banc May 12, 2020) (reviewing trial court's decision not to award prejudgment interest for abuse of discretion).

As an initial matter, we note that Mignon and Sydney do not argue on appeal that the trial court erred or abused its discretion in refusing to award them prejudgment interest on the amount of rent owed by Kim. Rather, the identified trial court error in their point relied on only pertains to the trial court's refusal to award prejudgment interest on the distribution. Additionally, the argument section of their brief is devoid of any assertion that the trial court erred or abused its

---

[16] This point relied on fails to comply with Rule 84.04(d), which requires points relied on "be in substantially the following form: 'The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*].'" This point relied on is not in the required form, nor does it purport to explain why the legal reasons, in the context of the case, support the claim of reversible error. Nonetheless, we exercise our discretion to review this claim on appeal. *See Ivie*, 439 S.W.3d at 199 n.11.

discretion in failing to award prejudgment interest on the rent due. Other than to note that the trial court was silent as to its reasons for denying prejudgment interest on the amount of rent owed, they focus entirely on the trial court's decision not to award prejudgment interest on the distribution amount. Thus, we do not address the trial court's determination not to award prejudgment interest on the rent due, as any challenge to that determination has been waived. *See Brunig v. Humburg*, 957 S.W.2d 345, 347 n.2 (Mo. App. E.D. 1997) ("Issues not raised on appeal are considered waived.").

Relating to the trial court's decision not to award prejudgment interest on the distribution amount, to the extent the trial court suggested that an award of such interest was not allowed absent a statue or contract authorizing it, that suggestion was incorrect. *See Akers v. City of Oak Grove*, 246 S.W.3d 916, 922 (Mo. banc 2008) ("[A]n allowance of [prejudgment] interest must be based upon either a statute or a contract, express or implied; except for actions in equity, in which case, it is a matter for the trial court's discretion."). However, the trial court provided an additional basis for refusing to award prejudgment interest on the distribution amount, namely that Mignon and Sydney had not sought a distribution in their petition. The trial court was within its discretion to deny them prejudgment interest on this basis.

Mignon and Sydney asserted three claims in this action: (1) to remove Kim as trustee; (2) a request for accountings (which they dismissed the second day of trial); and (3) financial restitution for Kim's personal use of trust assets. Each of these claims were either voluntarily dismissed or denied by the trial court. Although the trial court ultimately ordered the $250,000 distribution to Mignon and Sydney under the terms of the Raymond Trust, such order was in response to Count V of Kim's counter- and cross-claims, in which he requested instructions from the trial court regarding the disposition of trust assets. Without Kim asserting Count V, which was

23

ultimately granted, there would not have been before the trial court an avenue by which it could distribute trust assets.

"The theory of [prejudgment] interest in any case is compensation for the use or loss of the use of money to the person entitled to it." *Taylor*, 245 S.W.3d at 879. Because Mignon and Sydney did not seek distribution of the $250,000, the trial court was within its discretion to determine that they were not entitled to compensation for their "loss of the use" of that money. *Cf. Robinson*, 2020 WL 2392488, at *15 (affirming the trial court's decision not to award prejudgment interest to the plaintiff on the money judgment she received for the fair value of her stock; the trial court denied prejudgment interest, in part, because the plaintiff "never made any demand upon the defendants that they buy her stock, until she filed suit"); *see also Health Care Found. of Greater Kan. City v. HM Acquisition, LLC*, 507 S.W.3d 646, 668 (Mo. App. W.D. 2017) ("[T]he trial court may be guided by equitable principles of fairness and justice when determining whether to award prejudgment interest.").

Although Mignon and Sydney argue that "[a]n award of pre-judgment interest to Appellants was necessary both to prevent Kim from profiting from his serial delays in distributing the proceeds of both the trusts—in breach of his duties as trustee and solely for the purpose of extracting unmerited concessions from his sisters—and also to compensate Appellants from [sic] the lost time-value of the money of which Kim improperly deprived them," the trial court made numerous findings contrary to this assertion which they have not appealed, including finding that Kim "provided services above and beyond what a normal trustee would do," Kim acted reasonably in attempting to procure a settlement of this matter prior to Sydney and Mignon filing their petition, and "[r]ather than requesting the Court order distribution from the Raymond Trust, [Sydney and Mignon] decided to litigate the removal of the Trustee of the Raymond Trust and the required

24

accountings of the Raymond Trust, which litigation caused the delay in the distribution of the Raymond Trust." *See STRCUE, Inc. v. Potts*, 386 S.W.3d 214, 219 (Mo. App. W.D. 2012) (an appellant's failure to properly challenge a finding of the trial court that would support its judgment is fatal to her appeal). Thus, we find no basis for Mignon and Sydney's argument that an award of prejudgment interest was warranted due to Kim's actions.

For the reasons described above, we find the trial court did not abuse its discretion in declining to award Mignon and Sydney prejudgment interest.[17] Point IV is denied.

*The Trial Court's Adoption of Kim's Proposed Judgment*

Mignon and Sydney's fifth point relied on provides, in its entirety: "The trial court erred by 'rubber stamping' the proposed findings of fact and conclusions of law submitted by [Kim] without exercising its own independent judgment, as required by law." Again, this point relied on fails to comply with Rule 84.04(d), as it fails to follow the format required by the Rule and does not explain how the facts of the case and the principles of law interact. *See State v. Nunley*, 341 S.W.3d 611, 625 (Mo. banc 2011) (to comply with Rule 84.04(d), the point relied on must state "wherein and why" the action or ruling of the trial court was erroneous).

"A deficient point relied on that cannot be understood without resorting to the argument portion of the brief or record fails to preserve the argument for appellate review." *Prather v. City of Carl Junction, Mo.*, 345 S.W.3d 261, 265 (Mo. App. S.D. 2011); *see also Wallace v. Frazier*, 546 S.W.3d 624, 628 (Mo. App. W.D. 2018) ("Points that do not comply with the dictates of Rule 84.04(d) preserve nothing for our review[.]"). We decline to exercise our discretion to review this

---

[17] Mignon and Sydney argue in their reply brief that Judge Dump was without authority to sustain Kim's motion to amend the First Amended Judgment. However, this argument was not raised in their opening brief, and we do not consider arguments raised for the first time in a reply brief. *See Pearman v. Dep't of Soc. Servs.*, 48 S.W.3d 54, 55 (Mo. App. W.D. 2001) ("Assignments of error set forth for the first time in an appellant's reply brief do not present issues for appellate review.").

25

unpreserved claim. *See Downs v. Dir. of Adult Insts.*, 40 S.W.3d 19, 23 (Mo. App. W.D. 2001) (declining to address points relied on that failed to comply with Rule 84.04(d)).

Nonetheless, even if we were to review this claim of error on appeal, we would find no merit to Sydney and Mignon's assertion that the trial court "rubber stamped" Kim's proposed judgment. The trial court made various findings in the Second Amended Judgment that were not proposed by Kim. For example, the trial court's findings in paragraphs 92, 93, 94, 95, and 96 of the Second Amended Judgment differed significantly from those proposed by Kim. Thus, we would deny this point even if we were to review its merits.

Point V is denied.

## Conclusion

Points I, II, IV and V are denied. Point III is granted. We vacate the finding in favor of Kim on his claim for quantum meruit, and remand for further proceedings consistent with this opinion. The judgment is affirmed in all other respects.[18]

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

---

[18] Kim also filed a Motion for Attorneys' Fees and Costs on Appeal. That motion is denied.